UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
——————————————————————————X

WAYNE DEWALL,

        Petitioner,

   -against-

SUPERINTENDENT,
Mohawk Correctional Facility,

        Respondent.

——————————————————————————X

<u>MEMORANDUM & ORDER</u>
05-CV-5583 (NGG) (RLM)

NICHOLAS G. GARAUFIS, United States District Judge.

Petitioner Wayne Dewall ("Petitioner" or "Dewall") seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He is currently incarcerated in the Mohawk Correctional Facility, serving a sentence of four to eight years. In his petition, filed on December 8, 2005, Petitioner challenges the constitutionality of a judgment entered against him in the New York State Supreme Court, Queens County. Having reviewed the state court record and the parties' submissions, for the reasons set forth below, Petitioner's writ of habeas corpus is denied.

I.     **Background**

    A.    **Factual Background**

Petitioner and his ex-wife, Sandra Madrid Dewall ("Sandra Dewall"), separated in October 1999, six weeks after the birth of their son, Elijah Dewall ("Elijah"). (S. Dewall Tr. at 247, 253-54.) Sandra Dewall moved in with her mother in Flushing, Queens the same month with Elijah. (<u>Id.</u> at 247-48.) On November 8, 1999, Sandra Dewall obtained an order of

protection against Petitioner in Queens County Family Court. (Id. at 342.) In December 1999, Sandra Dewall commenced divorce proceedings against Petitioner. (Id. at 337.) In January 2000, Sandra Dewall moved to Bayside, Queens to live with her brother, Eduardo Madrid ("Madrid"). (Id. at 253.) On April 3, 2000, Sandra Dewall obtained an additional order of protection against Petitioner in Queens County Criminal Court ("Criminal Court Order"). (Id. at 248-54, 342.) The Criminal Court Order directed Petitioner to "stay away from the home of, school of, business of, police or employment"[1] of Sandra Dewall for three years and also to "refrain from assault, harassment, menacing, reckless endangerment, disorderly conduct, intimidation, threats, or any criminal offense against" Sandra Dewall. (Id. at 253.)

Petitioner continually requested to see Elijah after Petitioner's separation from Sandra Dewall. (Id. at 257.) Upon an agreement between Petitioner and Sandra Dewall, the Queens County Family Court on July 18, 2000 issued a visitation order ("Family Court Visitation Order") permitting Petitioner to visit with Elijah on alternate weekends starting on July 22, 2000 in the home of a mutual friend of Petitioner's and Sandra Dewall's, Barbara Fischer ("Fischer").[2] (Id. at 260-62.) The Family Court Visitation Order contained a clause that allowed Petitioner and Sandra Dewall to meet more often if they wanted to. (Id. at 262-63.) They agreed to do so by written agreement and they, in fact, never adhered to the schedule as set forth by the Family Court. (Id.)

---

[1] The transcript should probably read "place of employment," not "police or employment."

[2] Barbara Fischer was also referred to as "Barbara Fisher" in the transcript.

Petitioner violated the Criminal Court Order by having made threatening phone calls to Sandra Dewall and having appeared at Sandra Dewall's residence on September 30, 2000, October 1, 2000, and October 8, 2000.  On September 30, 2000, Petitioner left a threatening message on Sandra Dewall's digital answering machine.  On October 1, 2000, Petitioner allegedly shattered Sandra Dewall's living room window with a rock.  On October 8, 2000, Petitioner reappeared at Sandra Dewall's home and got into a fight with Madrid and Madrid's girlfriend, Sandra Baracaldo ("Baracaldo").  Madrid called the police after the fight.  New York City Police Officers John Twomey ("Officer Twomey") and Paul Aloisio ("Officer Aloisio") responded to the scene, whereupon they arrested Petitioner and took Madrid, Baracaldo and Petitioner to Queens General Hospital and Long Island Jewish Hospital.

At trial in the New York State Supreme Court, Queens County, the People presented testimony from Sandra Dewall, who testified about Petitioner's threatening phone calls and undesired visits to her home.  The People also called Madrid, who had lived with Sandra Dewall at the time, as well as Baracaldo, who had witnessed Petitioner's October 8, 2000 visit to Sandra Dewall's residence and who had been personally involved in the altercation that day.  The People also presented testimony from Officer Twomey and Officer Aloisio.  The officers testified about the events following Petitioner's arrest, including their recovery of a rake that Petitioner allegedly had used during the altercation, as well as Baracaldo's car registration documents and a screwdriver from Petitioner's pocket.  Defense counsel called Beth Chester ("Chester"), a forensic medical record examiner, who reviewed the hospital records of Baracaldo, Madrid and Petitioner from the October 8, 2000 altercation.

### i.     Testimony of Sandra Dewall

Sandra Dewall testified that she had left Petitioner in October 1999 due to his drinking problems.  (S. Dewall Tr. at 247, 253-54.)  In January 2000, she moved into her brother Madrid's house in Bayside, Queens with Elijah.  (Id.)

Sandra Dewall testified that, even though the Family Court Visitation Order had permitted Petitioner and Sandra Dewall to conduct visitations in Fischer's home, Fischer had stopped permitting the visitations.  (Id. at 264.)  According to Sandra Dewall's testimony, Fischer did not provide a reason for her decision.  (Id.)  As a result, Petitioner and Sandra Dewall continued the visitations at a public park.  (Id. at 264, 268-69.)  Sandra Dewall and Petitioner communicated about the dates and times of the visits by beeper.  (Id. at 264-65, 297-98.)  Sandra Dewall testified that she had never given Petitioner her home phone number or address and had never allowed him to come to her home or contact her there regarding visitation.  (Id. at 253-54, 267-70.)

On Saturday, September 30, 2000, at approximately 7:15 p.m., Sandra Dewall was in her bedroom when she heard Petitioner "screaming" her name in her backyard.  (Id. at 270.)  She called the police within ten minutes.  (Id. at 270, 330.)  Her telephone rang approximately half an hour later at 7:52 p.m.  (Id. at 271-72, 278.)  Sandra Dewall did not answer the call and allowed it to transfer to voicemail on her digital answering machine.  (Id.)  She listened as the caller left a message and recognized the caller's voice to be Petitioner's.  (Id.)  Sandra Dewall testified that Petitioner's message concerned Petitioner's right to see Elijah and also Petitioner's knowledge of her new relationship with her boyfriend Danny, whom she had been dating since March or

April.[3]  (Id. at 278-79.)   Sandra Dewall testified that Petitioner's message had scared her because she had never spoken to Petitioner about Danny.  (Id.)  Sandra Dewall then took Elijah and quickly left her house because she did not want to stay at home that night.  (Id. at 278-81.)

Sandra Dewall did not return to her house until one week later.  (Id. at 281.)  On Sunday, October 8, 2000, at approximately 10:30 p.m., a "constant banging" at her window awoke her. (Id.)  When Sandra Dewall went to her window, she saw Petitioner's face.  (Id. at 282.)  She became distressed and quickly pulled down her window shades.  (Id.)  Sandra Dewall then ran downstairs to alert Madrid and call the police.  (Id. at 283-84.)  The police went to Sandra Dewall's house and searched for Petitioner; however, neither Sandra Dewall, Madrid, nor the police were able to find Petitioner.  (Id.)

Sandra Dewall testified that she believed Petitioner had called her approximately "five [or] six times a day" and that she had known that the calls were from Petitioner despite most of the calls having been "hang-ups."  (Id. at 319-20.)  She also testified that, in total, she had received and recorded three messages from Petitioner on her answering machine.  (Id. at 318-19.)  In order to provide evidence of Petitioner's harassment of Sandra Dewall in violation of the Criminal Court Order, Sandra Dewall recorded Petitioner's September 30, 2000 message from her digital answering machine.  To collect the evidence, Sandra Dewall placed a small micro-cassette recorder next to her digital answering machine.  (Id. at 274-76.)  She then recorded Petitioner's message with the micro-cassette recorder.  (Id.)  Sandra Dewall handed the micro-cassette tape with Petitioner's September 30, 2000 message to the District Attorney's Office.

---

[3]  In his September 30, 2000 message to Sandra Dewall, Petitioner told Sandra Dewall to go " 'f–k' Danny 'a little bit more' because even if they 'lock [Petitioner] up, [Petitioner was] not going away.' "  (May 22, 2006 Affidavit and Memorandum of Law in Opposition to Petition for a Writ of Habeas Corpus ("People's Mem.") at 23).

(Id.)  The prosecutor then made a copy of the micro-cassette tape with a standard cassette tape.

(Id.)  The standard cassette tape created by the prosecutor and containing Petitioner's September 30, 2000 message ("Tape") was played for the jury during trial.  Sandra Dewall testified that nothing on the Tape had been changed or altered.  (Id.)

### ii.    Testimony of Eduardo Madrid

Madrid is Sandra Dewall's brother.  (E. Madrid Tr. at 366.)  Madrid testified that, after the Queens County Criminal Court had issued the Criminal Court Order on April 3, 2000, Sandra Dewall had moved into Madrid's house[4] in Bayside, Queens with Elijah.  (Id. at 367.)

Madrid testified that, at approximately 12:30 a.m. on October 1, 2000, he had heard the sound of glass shattering in the living room.  (Id. at 369.)  When Madrid went into the living room, he saw a rock the size of "two bricks" and a broken window.  (Id.)  Madrid then ran outside.  He saw Petitioner jumping over the back fence into Madrid's neighbor's yard.  (Id. at 369-70.)  Madrid testified that he had called out and had tried to stop Petitioner but that Petitioner had "just . . . laugh[ed] and kept running."  (Id. at 371.)  Madrid testified that he had later discovered that someone had cut his telephone wires and that the telephone lines had been rendered "dead."  (Id. at 372, 413.)  Madrid did not have photographs, repair bills, receipts or any other evidence corroborating the alleged window and telephone wire damage.  (Id. at 413-15.)

Madrid testified that at around 10:30 p.m. or 11:00 p.m. on October 8, 2000, Sandra Dewall had gone into Madrid's room, crying.  (Id. at 374-76.)  Madrid testified that he had suspected that Petitioner would "try to break into [their] house."  (Id. at 375-78.)  For that

---

[4]  This Memorandum & Order interchangeably refers to the residence that Madrid was sharing with Sandra Dewall as "Sandra Dewall's residence."

6

reason, some time after midnight, Madrid and Baracaldo sat in a car outside in the driveway to wait for Petitioner. (Id.) At around 2:30 a.m., Madrid saw Petitioner crawling from Madrid's neighbor's yard into the driveway. (Id. at 379-80.) Madrid then pulled out a metal collapsible baton. He and Baracaldo pursued Petitioner as Petitioner ran toward the street. (Id. at 382-85.) According to Madrid's testimony, Petitioner struck Madrid and Baracaldo with a garden rake. (Id.) After some struggling, Madrid pinned Petitioner to the ground. (Id. at 386.) Madrid and Baracaldo found and removed a screwdriver from Petitioner's pocket. (Id. at 387-88.) The police then arrived at the scene. (Id. at 388, 440.) According to Madrid's testimony, the police told Madrid to "get off" Petitioner. (Id. at 388.) Petitioner was then placed in an ambulance. (Id.) Madrid and Baracaldo were taken to the emergency room at the Long Island Jewish Hospital. (Id. at 388, 442.) Madrid testified that, as a result of having been struck by the garden rake, he had suffered "excruciating[ly] pain[ful]" lacerations to his left thumb and was unable to work for two weeks. (Id. at 388-89.)

### iii.    Testimony of Sandra Baracaldo

Baracaldo is Madrid's girlfriend and saw Petitioner at Sandra Dewall's residence on the night of October 8, 2000. (S. Baracaldo Tr. at 458.) Baracaldo was also personally involved in the altercation described above. (Id. at 460-70.) Baracaldo testified that Petitioner had struck her with a garden rake during the fight. (Id. at 471.) Consequently, Baracaldo's middle finger became swollen, and her fingernail became "torn and black." (Id.) After the altercation, Baracaldo was taken to the Long Island Jewish Hospital, where she had x-rays taken of her hand and was given pills for treatment. (Id. at 504.)

The morning after October 8, 2000, Baracaldo discovered that her car had been vandalized. She testified that her car window had been broken, that her car "cables" had been

cut, and that her registration sticker and New York State Department of Motor Vehicles registration card had been stolen. (Id. at 473.) Baracaldo testified that her car had been in good condition prior to October 8, 2000. (Id.)

At trial, Baracaldo identified the registration documents that had been recovered from Petitioner's pockets to be the same documents that had been taken from her car. (Id. at 474.) Baracaldo further testified that, as a result of her injuries from the altercation, she had been unable to work for three days. (Id. at 471-72.)

### iv.    Testimony of Petitioner

Petitioner testified that his relationship with ex-wife Sandra Dewall had soured because her family had been overly intrusive. (Petitioner Tr. at 592-93.) He also testified that he had been verbally abusive to Sandra Dewall during their marriage. (Id. at 592.) Petitioner further testified that he had been aware of the Criminal Court Order entered against him. (Id. at 594.)

Petitioner testified that, despite their visitation agreement, Sandra Dewall had often been unable to keep their scheduled visitations due to transportation and financial difficulties. (Id. at 598, 603.) He stated that, despite his efforts to "compromise," the visitations "never worked out," as Sandra Dewall would frequently change the times and days of the visits to suit her own convenience. (Id.) Petitioner testified that Sandra Dewall used to notify him by voicemail whenever she wanted to reschedule the visitations. (Id. at 597-98, 604.) On September 5, 2000, Petitioner learned of Sandra Dewall's home address because he had driven her home from Elijah's birthday party. (Id. at 598-99.) Petitioner testified that Sandra Dewall had also given him her telephone number when her voicemail had gotten "shut off." (Id. at 599.)

Petitioner testified that he and Sandra Dewall had arranged for Petitioner to bring child-support payments and child-care necessities to her bedroom window on non-visitation weekends.

(Id.)  Petitioner testified that, pursuant to this arrangement, he had gone to Sandra Dewall's residence to deliver money on September 30, 2000.  (Id.)  Petitioner testified that Sandra Dewall had previously informed him that she had planned to be away that evening and that he had arrived at her residence between 11:30 p.m. and 11:45 p.m.  (Id. at 605-06.)  Sandra Dewall's bedroom window was located in the "back far corner" of her house.  (Id. at 600.)  By using "a wire that [hung] from her window," Petitioner pulled himself up to Sandra Dewall's window.  (Id. at 606.)  He taped the money to the window and left diapers by her fence before returning to the front of Sandra Dewall's house.  (Id.)

Petitioner saw Madrid at the front of Sandra Dewall's house.  (Id.)  Petitioner and Madrid never got along, and they argued on Sandra Dewall's front lawn.  (Id. at 606-08.)  Madrid "picked something up off the ground [and] flung it at [Petitioner] but missed, [instead hitting] the front of [Sandra Dewall's] house."  (Id. at 607.)  Petitioner then left Sandra Dewall's house.  (Id.)

Petitioner testified that he had called Sandra Dewall's residence later that night.  (Id. at 609.)  He had left a message when he reached her answering machine, but he could not recall the substance of his message.  (Id. at 607-09.)

On October 8, 2000, Petitioner and Sandra Dewall spoke on the telephone about her need for diapers and child-care necessities.  (Id. at 609-10.)  Sandra Dewall agreed for Petitioner to visit her home that night.  (Id.)  Petitioner testified that he had paged Sandra Dewall and had left her a voicemail when he arrived near her home.  (Id. at 610.)  When he was about a block away from Sandra Dewall's house, Petitioner saw Baracaldo's car parked on the street.  (Id. at 627.)  Petitioner testified that the "passenger's side window" of Baracaldo's car had been shattered and that Elijah's car seat had been "hanging out of" Baracaldo's car.  (Id.)  Petitioner also found

some papers by Baracaldo's car.  (<u>Id.</u> at 642.)  Petitioner put the papers in his jacket pocket and picked up Elijah's car seat.  (<u>Id.</u> at 611, 642.)  He testified that he had intended to return the items to Sandra Dewall.  (<u>Id.</u> at 642.)

Petitioner arrived at Sandra Dewall's residence and handed her money, diapers and Elijah's car seat through her bedroom window.  (<u>Id.</u> at 612-14.)  As Petitioner spoke to Sandra Dewall through her window, Madrid burst into the bedroom, yelling.  (<u>Id.</u> at 611-13.)  Petitioner and Madrid had a heated argument.  (<u>Id.</u>)  Petitioner left Sandra Dewall's residence soon thereafter.  (<u>Id.</u> at 613.)  Petitioner did not give Sandra Dewall the papers he had found.

Upon returning to his car, Petitioner realized that he no longer had his car keys.  (<u>Id.</u> at 614.)  He testified that he believed that he had dropped his keys while visiting Sandra Dewall.  (<u>Id.</u>)  Due to the unpleasant atmosphere at Sandra Dewall's house, however, Petitioner waited "about four or five hours" prior to returning to retrieve his keys.  (<u>Id.</u>)  As Petitioner returned to Sandra Dewall's house, Petitioner was confronted by Madrid and Baracaldo.  (<u>Id.</u> at 615.)  According to Petitioner's testimony, an altercation then ensued in which Madrid struck Petitioner four times with a nightstick.  (<u>Id.</u> at 616-22.)  Petitioner also testified that Baracaldo had hurt herself after she had stepped on a rake.  (<u>Id.</u> at 621.)  Madrid then called the police.  (<u>Id.</u> at 624.)  When the police arrived, Petitioner was carrying a screwdriver and the papers he had found in his pocket.  (<u>Id.</u> at 625.)  Petitioner was then arrested and taken to the Queens General Hospital by Officer Aloisio.  (<u>Id.</u> at 626.)

Petitioner further testified that it was indeed his voice on the Tape, the recording of the September 30, 2000 message that was played for the jury.  (<u>Id.</u> at 631-32.)  However, Petitioner was unsure whether the message on the Tape was actually from September 30, 2000 because he had called Sandra Dewall on numerous occasions about "all different issues."  (<u>Id.</u> at 632.)

Petitioner testified that he had not used his screwdriver or a rake to strike Madrid or Baracaldo during the October 8, 2000 altercation. (Id. at 623-24, 626, 651.) Petitioner also testified that he had carried a screwdriver in his pocket because he was an auto mechanic. (Id. at 625-26.) Petitioner further testified that he had not broken Baracaldo's car window or caused damage to Baracaldo's car. (Id. at 627-28.)

### v. Testimony of the Remaining Witnesses

The People called Officers Twomey and Aloisio, who had been two of the responding officers on October 8, 2000. Officer Twomey testified that, upon his arrival at Sandra Dewall's home, he had seen Madrid sitting on top of Petitioner. (J. Twomey Tr. at 219.) Officer Twomey found a rake lying "a few feet" away from Petitioner at the scene of the altercation. (Id. at 222-23.) Officer Twomey also recovered a screwdriver from the scene, which had been handed to him by either Baracaldo or one of the police officers. (Id. at 223.) Officers Twomey and Aloisio then arrested Petitioner. (Id. at 235; P. Aloisio Tr. at 361-62.) Officer Aloisio escorted Petitioner to the Queens General Hospital. (P. Aloisio Tr. at 361-62). At the hospital, Officer Aloisio recovered a New York State Department of Motor Vehicles registration sticker and card for Baracaldo's vehicle from Petitioner's pocket. (Id. at 363-64.)

Defense counsel called Chester, a forensic-medical-record examiner, who had reviewed the emergency medical records of Baracaldo, Madrid and Petitioner from the October 8, 2000 altercation. (B. Chester Tr. at 541-51.) Chester testified that Madrid had suffered mostly minor soft-tissue injuries and that Baracaldo had a "contusion to [her] finger" on her right hand. (Id. at 548.) Chester further testified that Petitioner had lacerations on his face and head caused by a metal object. (Id. at 549-50.) According to Chester's testimony, Petitioner's wounds required sutures. (Id. at 551.)

## II.      Procedural Background

After the jury trial, Petitioner was convicted of five counts of Criminal Contempt in the First Degree, two counts of Assault in the Third Degree, one count of Criminal Mischief in the Fourth Degree, and one count of Criminal Possession of Stolen Property in the Fifth Degree. (See People's Mem. at 3).  A First-Degree Criminal Contempt charge based on Petitioner's alleged telephone harassment of Sandra Dewall was dismissed on the People's motion.  (Id.) Petitioner was acquitted of Second-Degree Assault charges involving Madrid and Baracaldo and of a criminal mischief charge for allegedly having thrown a rock through Madrid's window. (Id.)

Through counsel, Petitioner appealed his conviction to the New York State Supreme Court Appellate Division, Second Department in November 2003, arguing that: 1) the evidence of First-Degree Criminal Contempt was legally insufficient because, since Sandra Dewall was not physically at home when Petitioner went to her residence, Petitioner had not violated the Criminal Court Order that required him to "stay away" from her; 2) the Tape was erroneously admitted at trial in violation of the state's best evidence rule because the Tape was not the original, but merely "secondary," evidence; and 3) at sentencing, the court improperly mischaracterized Petitioner's 1987 assault of a former girlfriend as "rape" and also denied Petitioner due process by "illegally" issuing an order of protection in favor of Fischer and her daughter when Fischer and her daughter did not serve as witnesses to the trial, were not present at sentencing, and did not make any statements.  (November 2003 Brief for Defendant-Appellant ("App. Brief") at 2-3).

The Appellate Division agreed with Petitioner on his first claim and held that the evidence was insufficient to support his conviction for Criminal Contempt in the First Degree.

As a result, the Appellate Division modified the trial court judgment, reducing Petitioner's conviction of Criminal Contempt in the First Degree in violation of N.Y. Pen. L. § 215.51(c) to the lesser-included offense of Criminal Contempt in the Second Degree in violation of N.Y. Pen. L. § 215.50(3). The Appellate Division held Petitioner's remaining contentions to be "either unpreserved for appellate review or . . . without merit." People v. Dewall, 790 N.Y.S.2d 182, 185 (App. Div. 2d Dep't 2005). The Appellate Division thereby affirmed the remainder of Petitioner's convictions and remitted the matter back to the trial court for re-sentencing on the conviction of Criminal Contempt in the Second Degree. (Id.) At Petitioner's re-sentencing hearing on March 16, 2005, the trial court sentenced Petitioner to a one-year term on the Second-Degree Criminal Contempt conviction, to be served concurrently with his sentence on the affirmed convictions, for an aggregate maximum sentence of eight years' imprisonment. (People's Mem. at 5).

On July 7, 2005, the New York Court of Appeals denied Petitioner leave to appeal. People v. Dewall, 835 N.E.2d 668 (N.Y. 2005). Subsequently, on October 14, 2005, Petitioner filed a pro se application for a writ of habeas corpus in the U.S. District Court for the Northern District of New York. On November 3, 2005, U.S. Magistrate Judge George H. Lowe transferred the case to the Eastern District of New York pursuant to 28 U.S.C. § 1404(a). (People's Mem. at 6). Petitioner now seeks a writ of habeas corpus pursuant to 18 U.S.C. § 2254 on three grounds, all of which have been exhausted in state court.

First, Petitioner argues that the trial court admitted the Tape in violation of his constitutional due process rights to a fair trial by producing "secondary evidence" and not the original messages that he left on Sandra Dewall's digital answering machine. (December 8, 2005 Petition ("Petition") at 4). Second, Petitioner claims that he was sentenced under

"materially unreliable and inaccurate information" in violation of his constitutional due process rights when his prior criminal conviction of Assault in the Second Degree was mischaracterized by the People and the sentencing court as a "prior rape case." (Id. at 3). Finally, Petitioner argues that the sentencing court violated his due process rights when the court "illegally" issued an order of protection in favor of non-witnesses to the trial, Fischer and her daughter. (Id.)

## III.   Discussion

### A.   Standard of Review

The standard of review for habeas corpus petitions filed by state prisoners is set forth in 28 U.S.C. § 2254(d), as amended by the Anti-Terrorism and Effective Death Penalty Act ("AEDPA").  Under § 2254(d), if Petitioner's claims have been fully adjudicated on the merits in state court, he must show that the state-court proceedings:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State[-]court proceeding.

28 U.S.C. § 2254(d) (1996).  A state court's decision is contrary to clearly established Federal law as set forth by the Supreme Court "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent."  Williams v. Taylor, 529 U.S. 362, 412 (2000).  Further, a state-court decision is an "unreasonable application" of the law "if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies it to the facts of the particular state prisoner's case."  Id. at 407.

Accordingly, this court cannot grant Petitioner's writ if it merely "concludes in its independent judgment that the relevant state-court decision applied clearly established Federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. In order to grant the writ, there must be "some increment of incorrectness beyond error." Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000) (internal quotation marks omitted). However, "the increment need not be great; otherwise, habeas relief would be limited to state[-]court decisions so far off the mark as to suggest judicial incompetence." (Id.)

Furthermore, to determine whether AEDPA's deferential standard applies, this court must first determine whether the state court considered Petitioner's claims on their merits. Ryan v. Miller, 303 F.3d 231, 245 (2d Cir. 2002) (citations omitted). A state court has adjudicated a state petitioner's claim on the merits when it "(1) disposes of the claim 'on the merits,' and (2) reduces its disposition to judgment." Sellan v. Kuhlman, 261 F.3d 303, 312 (2d Cir. 2001). The state court's decision, however, need not "explicitly refer to either the federal claim or to relevant federal case law." Id.

Where the Appellate Division disposes of a group of claims by proclaiming them " 'either unpreserved for appellate review or without merit,' the validity of the claims are preserved and are subject to federal review." Fama v. Comm'r of Corr. Svcs., 235 F.3d 804, 810 (2d Cir. 2000). However, the Second Circuit has ruled inconsistently on whether AEDPA deference applies when confronted by such language, and has referred to its decisions in the area as "anything but clear." Shih Wei Su v. Filion, 335 F.3d 119, 126 (2d Cir. 2003). The Second Circuit has held that AEDPA deference should be given to a state-court decision that had disposed of a claim for being "either unpreserved for appellate review or without merit." See Miller, 303 F.3d at 246 (treating a state-court decision as having been ruled on on the merits because the petitioner had preserved the

disputed claim at every stage, therefore indicating that the Appellate Division had not denied that claim because it was unpreserved).  On the other hand, the Second Circuit has also held that where a state-court ruling is unclear on whether a claim was rejected for procedural or substantive reasons and where the record does not otherwise preclude the possibility that the claim was denied on procedural grounds, AEDPA deference is not warranted because it is uncertain whether the state-court decision was on the merits.  See Miranda v. Bennett, 322 F.3d 171, 178 (2d Cir. 2003).

In the instant case, the Appellate Division disposed of all three of Petitioner's habeas claims using the blanket language "unpreserved for appellate review or . . . without merit."  Dewall, 790 N.Y.S.2d at 185.  Presumably, some of Petitioner's claims may have been disposed of without having actually been adjudicated on the merits.  Nevertheless, since the Second Circuit in Miller has concluded that the phrase "either unpreserved for appellate review or without merit" is sufficient to indicate an adjudication on the merits, 303 F.3d at 246, AEDPA deference will be given to the state-court judgment here.  See also Jimenez v. Walker, 458 F.3d 130, 146 (2d Cir. 2006).  In any event, this distinction is immaterial, for the Appellate Division provided no reasoning to which this court can offer deference.

### B.  Petitioner's Best Evidence Rule Claim Regarding Admission of the Tape During Trial

As a preliminary matter, Petitioner has satisfied the exhaustion requirements of the federal habeas statute, 28 U.S.C. § 2254 (1976), because he has "limited [his] appeal to an issue that had been raised and rejected by the appropriate state courts."  Taylor v. Curry, 708 F.2d 886, 889 (2d Cir. 1983).  Further, since the Appellate Division dismissed the instant claim as having been "not preserved for appellate review . . . or without merit,"  Dewall, 790 N.Y.S.2d at 185,

this issue has been decided on the merits and AEDPA deference therefore applies.  See Miller, 303 F.3d at 246.

Petitioner argues that the trial court's admission of the Tape as evidence of his contempt of the Criminal Court Order violated the state's best evidence rule, thereby depriving him of his due process rights to a fair trial under the Fourteenth Amendment to the United States Constitution.  (Pet. at 3).  Petitioner argues that the Tape should not have been admitted under the best evidence rule because the Tape was not the original but was "less convincing '[s]econdary [e]vidence.' "  (Id.)  Petitioner further claims that, because the Tape was secondary evidence, the People were required by the best evidence rule to offer a sufficient explanation for having failed to produce the original message.  Petitioner argues that, because the People offered "no explanation whatsoever, let alone a valid one," the Tape was erroneously admitted during trial.  (Id.)  Petitioner also argues that the Tape should not have been admitted because Sandra Dewall had tampered with the Tape and that, as a result, the Tape was unreliable.  (Id.)

Petitioner's claims regarding the propriety of the Tape's admission and the possibility of tampering are without merit.  Even assuming, *arguendo*, that the trial judge erred in allowing the Tape's admission, the error was not one of constitutional dimension that would warrant habeas relief.  Further, Petitioner's claims involve state-law evidentiary matters and are not federal constitutional questions appropriate for habeas review.  See, e.g., Lyons v. Girdich, No. 02-CV-3117 (JBW), 2003 WL 22956991, at *12 (E.D.N.Y. Oct. 15, 2003) (alleged violations of the best evidence rule are evidentiary issues involving state law and are not federal constitutional questions appropriate for habeas review); United States ex rel. Banks v. Henderson, 394 F. Supp. 1316, 1318 (S.D.N.Y. 1974) (violation of the best evidence rule "is not a topic for federal habeas").  "Federal habeas corpus relief does not lie for errors of state law."  Estelle v. McGuire,

502 U.S. 62, 67-68 (1991).  This court is limited to deciding whether a conviction "violated the Constitution, laws, or treaties of the United States."  Id.

Although, as stated above, "[f]ederal habeas corpus relief does not lie for errors of state law," id., the Due Process Clause of the Fourteenth Amendment requires state courts conducting criminal trials to "proceed consistently with 'that fundamental fairness' which is 'essential to the very concept of justice.' " Dunnigan v. Keane, 137 F.3d 117, 125 (2d Cir. 1998).  Therefore, Petitioner's claim may be cognizable on habeas review if the state error violated the Due Process Clause.  Here, Petitioner argues that the admission of the Tape had violated his due process rights to a fair trial.  For Petitioner to prevail on a claim that an evidentiary error amounted to a deprivation of due process, he must show that the error was "so pervasive as to have denied him a fundamentally fair trial." Collins v. Scully, 755 F.2d 16, 18 (2d Cir. 1985) (internal citations omitted).  The standard for whether Petitioner was deprived of a fundamentally fair trial is "whether the erroneously admitted evidence, viewed objectively in light of the entire record before the jury, was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." Id. at 19.  Thus, in order to find whether Petitioner was deprived of a fundamentally fair trial, this court must decide whether the Tape was sufficiently material such that the non-admission of the Tape during trial would have created a reasonable doubt of Petitioner's guilt for the jury when the jury assessed the totality of the evidence. Id.  If the jury would not have had reasonable doubt about Petitioner's guilt had the Tape been excluded, habeas relief is not justified. Id.

Applying the foregoing standard, this court does not find the Tape to be sufficiently material because, viewing the totality of the evidence, the "prosecution [had] presented highly

probative evidence of [Petitioner's] guilt." Johnson v. Ross, 955 F.2d 178, 181 (2d Cir. 1992) (erroneously admitted evidence was not sufficiently material to provide the basis for conviction or to remove a reasonable doubt for the jury of petitioner's guilt because, when viewed in the context of the entire record, the witness testimony and surrounding facts would have convicted petitioner of the same crime). Here, Petitioner's "unlawful course of conduct" (People's Mem. at 23) and the witness testimony corroborating his acts were sufficient to prove that Petitioner violated the Criminal Court Order.

Petitioner engaged in an "unlawful course of conduct" and "unlawfully threatened" Sandra Dewall in several ways over a ten-day period. (Id. at 23, 25). In contravention of the Criminal Court Order, which expressly directed Petitioner to stay away from Sandra Dewall's home, school, business, and place of employment for three years and also to "refrain from assault, harassment, menacing, reckless endangerment, disorderly conduct, intimidation, threats, or any criminal offense against" Sandra Dewall, Petitioner failed to stay away from Sandra Dewall by going to her residence on the nights of September 30, 2000 and October 8, 2000. (S. Dewall Tr. at 253.) Petitioner's appearance in Sandra Dewall's backyard on September 30, 2000 alarmed her so much that she called the police within ten minutes. Following Petitioner's appearance that night, Sandra Dewall left her house for a week. When Sandra Dewall returned to her home on October 8, 2000, Petitioner again visited her home, this time appearing at her bedroom window at 10:30 p.m. Once again, Sandra Dewall was so frightened that she immediately called the police. Although Petitioner testified that he had Sandra Dewall's permission to visit her home on September 30, 2000 and October 8, 2000, the mere fact that Sandra Dewall quickly called the police each time she realized Petitioner was near her substantially weakens any possibility that Petitioner had been invited.

The witness testimony offers additional proof of Petitioner's unlawful presence and activities on Sandra Dewall's property. The altercation between Petitioner, Madrid and Baracaldo had occurred while Madrid and Baracaldo had been guarding Sandra Dewall and Sandra Dewall's home. Thus, the testimony of Madrid, Baracaldo, and Police Officers Twomey and Aloisio regarding Petitioner's physical presence and subsequent arrest in front of Sandra Dewall's house on October 8, 2000 directly evidences Petitioner's contempt of the Criminal Court Order. Thus, on review of the entire record, even if the Tape had not been admitted during trial, Petitioner's uninvited and unwelcome visits to Sandra Dewall's home on September 30, 2000 and October 8, 2000 would have shown that Petitioner failed to stay away from and harassed Sandra Dewall in violation of the Criminal Court Order on at least two occasions. Therefore, the People presented enough facts and testimony apart from the Tape to prove that Petitioner had violated the Criminal Court Order. Accordingly, under Ross, the admission of the Tape was not sufficiently material to provide the basis for conviction or to remove a reasonable doubt in the jury about Petitioner's guilt. Additionally, since the Tape was not material evidence, any error in connection with the admission of the Tape, if there was one, would have to be considered harmless, and would not warrant habeas relief. Brecht v. Abrahamson, 507 U.S. 619, 623 (1993) (errors of constitutional dimensions will warrant habeas corpus relief only if they had a "substantial and injurious effect or influence in determining the jury's verdict").

Furthermore and in any event, the trial court did not err when it admitted the Tape. Under New York law, the best evidence rule requires the production of an original record where the record's "contents are in dispute and sought to be proven." Schozer v. William Penn Life Ins. Co. of New York, 644 N.E.2d 1353, 1353 (N.Y. 2003) (internal citations omitted). As an exception to the best evidence rule, secondary evidence of the contents of an unproduced

original "may be admitted upon threshold factual findings by the trial court that the proponent of the substitute has sufficiently explained the unavailability of the primary evidence." Id. In that respect, secondary evidence is admissible so long as the state court is satisfied that the secondary evidence is a "reliable and accurate portrayal of the original" and that the "proffered evidence is authentic and 'correctly reflects the contents of the original.' " Id. Once a sufficient foundation for admission of the evidence is presented, the secondary evidence is "subject to an attack by the opposing party not as to admissibility but to the weight to be given the evidence, with [the] final determination left to the trier of fact." Id.

The trial court's decision to admit the Tape comported with New York law. Here, the People sufficiently explained that the original message was unavailable for production because the original message had been collected by a digital answering machine that did not have a tape. The People laid the proper foundation for introducing the Tape by informing the jury of how the message had been transferred from a digital answering machine to the Tape. (Tr. at 273-75.) Sandra Dewall then attested to the reliability of the Tape by testifying that nothing on the Tape had been changed or altered. (S. Dewall Tr. at 274-76.) Consequently, the court properly noted that "sufficient ground work" had been laid. (Tr. at 357.) See People v. Fondal, 546 N.Y.S.2d 26, 27 (App. Div. 2d Dep't 1989) (holding that sufficient foundation for the introduction of a copy of an original videotape into evidence had been laid where a trial witness had declared the copy to be an accurate depiction of the events that the witness had observed). The court was satisfied with the People's explanation for their failure to produce the original message and allowed the admission of the Tape "despite the best evidence rule." (Tr. at 353, 277, 570.) In accord with Schozer, the court then allowed defense counsel to cross-examine Sandra Dewall

regarding the Tape. The court also permitted defense counsel to play to the jury parts of the Tape that defense counsel claimed contained evidence of tampering or alteration. (Id. at 559-63, 568-70.) Thus, the trial court did not err by admitting the Tape because an adequate foundation had been laid and defense counsel had a full opportunity to attack the weight of the Tape to the jury.

For the aforementioned reasons, Petitioner is unable to show that the trial court's admission of the Tape deprived him of a fundamentally fair trial in violation of his due process rights.

### C. The Trial Court's Reference to Petitioner's Assault Conviction As the "Prior Rape Case" During Sentencing Proceedings

In 1987, Petitioner was convicted of Assault in the Second Degree under N.Y. Pen. L. § 120.05, pursuant to a guilty plea in a case alleging the rape and abuse of his former girlfriend Dawn Robinson[5] ("Robinson"). (People's Mem. at 27). Petitioner was sentenced to an indeterminate term of one-and-one-half to four-and-one-half years of imprisonment for the crime. (Id.) Petitioner's Pre-Sentence Probation Report ("Probation Report") contained a detailed account of the assault case. The account was "based on information obtained from the court papers, the records of the District Attorney, and the statement of" Robinson. (Probation Report at 3). The sentencing judge, the People, and defense counsel had all reviewed the Report prior to Petitioner's sentencing hearing ("Sentencing Hearing"). (Indeterminate Sentence Hearing Transcript ("Sentencing Tr.") at 2, 30.)

During the Hearing, the judge referred to Petitioner's assault case as a "prior rape case." (Sentencing Tr. at 30.) Petitioner now argues that the sentencing judge mischaracterized

---

[5] Dawn Robinson was also referred to as "Dawn Robertson" and "Dawn Patterson" in the instant case.

Petitioner's criminal history and "improperly sentenced [Petitioner] on the basis of materially inaccurate information." (Petition at 1-2). Petitioner asserts that, consequently, his due process rights were violated and seeks vacatur of his sentence and remand to a different judge for re-sentencing. (Id.)

Petitioner's claim is unavailing. Sentencing procedure is "subject to due process rights" under the Fifth Amendment. Torres v. United States, 140 F.3d 392, 404 (2d Cir. 1998). Due process requires that Petitioner: (1) "not be sentenced based on materially false information," id. (citing Townsend v. Burke, 334 U.S. 736, 740-41 (1948)); (2) "not be sentenced based on a material misapprehension of fact," Torres, 140 F.3d at 404 (citing United States v. McDavid, 41 F.3d 841, 843-44 (2d Cir. 1995)); and (3) "be given notice and an opportunity to contest the facts upon which the sentencing authority relie[d] in imposing the sentence." Torres, 140 F.3d at 404 (citing Burke, 334 U.S. at 741). Petitioner has not demonstrated any of these violations and thus has failed to show a deprivation of due process.

### i.    Whether the Sentencing Court Relied on Materially False Information

The first inquiry is whether the sentencing judge's reference to Petitioner's assault case as a "prior rape case" constituted a reliance on materially false information. "[Materially] false assumptions as to any facts relevant to sentencing . . . renders the entire sentencing procedure invalid as a violation of due process." Burke, 334 U.S. at 740-41 (holding charges that the petitioner had previously been found not guilty to constitute materially false information that should not have been considered in sentencing petitioner). However, "[n]ot every defect in the sentencing process . . . is of constitutional dimension." United States v. Malcolm, 432 F.2d 809, 816 (2d Cir. 1970) (explaining that, "standing alone," a sentencing judge's misstatement that the

petitioner had committed "five armed robberies" was, "as a purely factual matter," merely a "technical" error that was not "materially untrue" because the petitioner had "pleaded guilty to two [robberies] . . . and had admitted [to] three others"). Id.

In the instant case, the court's reference to the "prior rape case" did not constitute materially false information. The assault case was described in the Report as follows:

> After stopping his vehicle, [Petitioner] began slapping [Robinson] several times and threatened her that she would never see her family again. He then pulled up [Robinson's] nurse's uniform and pulled down her pantyhose and panties and forced his penis into her vagina. After *forcibly raping* [Robinson, Petitioner] dragged her on to an open field . . . and continued to beat her about her face and body. After physically abusing her, [Petitioner] returned [Robinson] back to her auto. [Petitioner] fled. [Robinson] immediately notified the police and was subsequently taken to Queens General Hospital *where she reported the [r]ape.*

(Probation Report at 3) (emphasis added). As evidenced in its description of the assault case, the Probation Report itself used the word "rape." Although Petitioner claims that his sentence was based on "materially inaccurate information" because his assault charge had been called "rape" by the court (Petition at 1-2), Petitioner never disputed the accuracy of the Probation Report, either during the Sentencing Hearing or in his Petition. Thus, under Malcolm, "as a purely factual matter," there was "nothing materially untrue" about the court's reference to the assault case as the "prior rape case." 432 F.2d at 816. Thus, Petitioner's constitutional due process rights were not violated.

### ii.	Whether the Court Sentenced Petitioner Based on A Material Misapprehension of Fact

The second inquiry under Torres is whether the trial judge sentenced Petitioner under a material misapprehension about the facts of Petitioner's assault case. A misapprehension of fact occurs if the sentencing court had material "[m]isinformation or misunderstanding . . . regarding [Petitioner's] prior criminal record." Malcolm, 432 F.2d at 815, 816 (finding a material

misapprehension of fact where the sentencing judge had "twice emphasized mistakenly that [the petitioner] had pleaded guilty to four other crimes," thereby showing that the judge had been "confused, if not altogether mistaken, about the petitioner's prior criminal record"); see also McDavid, 41 F.3d at 841 (finding a material misapprehension of fact where the judge sentenced the petitioner under the mistaken belief that petitioner had been on probation when petitioner committed the crime). In instances where the sentencing judge had a material misapprehension of fact, the confusion renders "the entire sentencing procedure invalid as a violation of due process." Malcolm, 432 F.2d at 816.

In the instant case, the record does not indicate that the sentencing judge had a material misapprehension about Petitioner's assault case. Prior to sentencing Petitioner, the judge stated:

> I was the Judge on the trial of this matter, and looking over [Petitioner's] prior criminal history, he has an extensive criminal history dating back to 1978, actually very poor probation reports from like 1979 on; even back then [he] had unfavorable reports. *He has a history of violent anti-social behavior*, *including a prior rape case of a former girlfriend, a drinking problem which seems to be admitted to, and prior criminal contempt cases.* Taking the arguments of everyone, all arguments presented before the Court, the Court is going to find as follows . . .

(Sentencing Tr. at 29-30) (emphasis added). Unlike in Malcolm and McDavid, the record in the instant case does not show that the sentencing judge was confused about Petitioner's criminal history when the judge referred to Petitioner's assault case as "the prior rape case." During the Sentencing Hearing, the judge stated explicitly that he had read the Probation Report. (Id. at 2, 30.) The judge then spoke accurately about Petitioner's criminal history. Although the judge may have technically misspoken when he called Petitioner's assault conviction a "rape case," the judge spoke in the same general language as he did when he had referred to Petitioner's other prior convictions of criminal possession, attempted criminal mischief, and other charges as

"criminal contempt cases." (Probation Report at 2; Sentencing Tr. at 30.) Whereas a "combination of procedural irregularities, confusion, misunderstanding and misinformation in the sentencing process . . . requires reversal," <u>Malcolm</u>, 432 F.2d at 818, the judge's statement here was more "a matter of semantics than of substance." <u>Id.</u> at 816. Additionally, the judge had heard statements from both Petitioner and the People regarding the assault case. (Sentencing Tr. at 30.) Because the Probation Report and the facts regarding the assault case had been addressed several times throughout the Sentencing Hearing, it is unlikely that the judge had any material misunderstandings about Petitioner's criminal history. Thus, the sentencing court did not sentence Petitioner based on a material misapprehension about Petitioner's assault case, and therefore this court does not find a violation of Petitioner's due process rights.

### iii. Whether Petitioner was Given Notice and an Opportunity to Contest the Facts Upon Which the Sentencing Court Relied in Imposing His Sentence

The final inquiry under <u>Torres</u> is whether Petitioner was given notice that the sentencing court would refer to Petitioner's prior criminal history in arriving at his sentence and whether Petitioner had been provided the opportunity to communicate to the sentencing court that his prior assault charge was not a rape conviction.

First, Petitioner and defense counsel were given notice about the facts upon which the sentencing court would rely in imposing Petitioner's sentence. At the beginning of the Sentencing Hearing, the court informed the People and defense counsel that the court had reviewed the Probation Report and inquired if the People and defense counsel had had the opportunity to do the same. (Sentencing Tr. at 2.) Both parties replied that they had done so. (<u>Id.</u>) Therefore, Petitioner and defense counsel were aware that Petitioner's criminal history, as

outlined in the Probation Report, would be considered by the judge in fashioning Petitioner's sentence.

Second, the court never denied Petitioner or defense counsel the opportunity to rectify any errors regarding Petitioner's criminal history. In order to prove that he was denied such an opportunity, Petitioner must show that the court "essentially refused, without justification, to allow defense counsel to rectify fundamental factual errors regarding . . . [Petitioner's] prior criminal record." Mejia v. United States, No. 06-Civ.-5322 (DLC), 2007 WL 2403049, at *5 (S.D.N.Y. Aug. 22, 2007); see Malcolm, 432 F.2d at 815-16 (finding that the petitioner had not been given any opportunity to contest fundamental factual errors where the court would not allow petitioner or defense counsel to correct the record after the court repeatedly attributed incorrect convictions to petitioner). Here, after the judge called Petitioner's assault conviction "the prior rape case," defense counsel made no objections and went on to address the court on an entirely different matter. Thus, defense counsel had the opportunity but failed to contest the judge's reference to "the prior rape case." Because defense counsel failed to object on the issue, any possibility that the court had "essentially refused, without justification, to allow defense counsel to rectify fundamental factual errors regarding . . . [Petitioner's] prior criminal record" is substantially undermined. Mejia, 2007 WL 2403049, at *5.

Even though defense counsel had failed to object after the court referred to the "prior rape case," the record shows that Petitioner was given an opportunity to clear the record in advance and communicate to the judge that Petitioner had been convicted of assault and not rape. Earlier in the Sentencing Hearing, the prosecutor mentioned the assault case and had stated

to the court that Petitioner had "assaulted . . . [and] raped" Robinson.  (Sentencing Tr. at 9.)

Petitioner later objected to the prosecutor's assertion, stating that:

> As far as the *District Attorney bringing up the fact that I victimized a woman or that I raped a woman*, they didn't suggest that when they found out she was three months pregnant when she made that allegation, and her name was [Robinson].  They also didn't argue the point when there [were] four abortion tickets put in front of them.  *I did raise my hand to this woman*.  But if the District Attorney felt that I really, truly abused that woman, then she should have brought hospital records in because *it didn't substantiate what I pled guilty to*.  But I was guilty to a certain extent, so I took my punishment and went on my way.

(Id. at 25) (emphasis added).  As evidenced by the record, Petitioner had the opportunity to

explain to the court that he had pleaded guilty to assault.  Therefore, Petitioner had an adequate

opportunity to contest any assertion that he had previously been convicted of rape.

In any event, as addressed above, the sentencing court's reference to Petitioner's assault

case as a "prior rape case" did not constitute materially false information that Petitioner and

defense counsel needed to rectify with the court.  Thus, Petitioner's due process rights were not

violated.

### D.    Petitioner's Challenges to the Court's Issuance of Orders of Protection for Fischer and Samantha Fischer

During Petitioner's Sentencing Hearing, the trial judge issued orders of protection in

favor of Fischer and her daughter, Samantha Fischer.  Because Fischer and Samantha Fischer

were not witnesses in Petitioner's trial and were not named as witnesses in the Indictment,

Petitioner now challenges the appropriateness of the court's issuance of the orders of protection.

During the Sentencing Hearing, Sandra Dewall testified, for the first time, that Petitioner

had allegedly harassed Fischer and had written a threatening letter to Fischer. (Sentencing Tr. at

4-5.) She testified that Petitioner:

> . . . damaged my brother's, his girlfriend's and [Fischer's] cars by either breaking
> into them, breaking windows and letting the air out of the tires . . . [Petitioner]
> sent . . . [Fischer] a copy of her old driver's license and a threatening note with it.
> He signed her daughter's name Samantha, an 11 year old who is now in fear as
> well.

(Id. at 5, 7.) Petitioner did not challenge the accuracy of Sandra Dewall's statements to the court

during the Sentencing Hearing. After the court considered Sandra Dewall's statements, the court

issued final orders of protection in favor of Fischer and Samantha Fischer, in the interest of

"protecting the citizens of [Queens] county." (Id. at 31-32.) Defense counsel objected,

contesting the validity of the issuance of the orders of protection because neither Fischer nor

Samantha Fischer had testified at trial, been present at the hearing, or had requested the orders of

protection. (Id. at 32.) Over defense counsel's objection, the court issued the orders of

protection, explaining that there had been "sufficient evidence presented before [the] court

during trial" to do so. (Id.)

Petitioner now challenges the issuance of the orders of protection on two grounds. First,

he argues that, under New York law, trial courts have "no power to issue an 'adjunctive' order of

protection" under N.Y. Crim. Proc. L. § 530 "in favor of someone who [was] neither a witness

nor a victim in that proceeding." (Petition at 7) (citing People v. Konieczny, 813 N.E.2d 626,

626 (N.Y. 2004)). He argues that, because Fischer and Samantha Fischer had not been witnesses

to his trial and did not appear during the Sentencing Hearing, the trial court should not have

issued the orders of protection. (Petition at 7). Second, Petitioner contends that, under the

Confrontation Clause of the Sixth Amendment, he was deprived of the right to face his accusers. (Id. at 8). He argues that, consequently, his constitutional due process rights have been violated. (Id.) Petitioner requests that the orders of protection be vacated. (Id.) He argues that Fischer should "come to court if she needs an order of protection." (Id.)

The first inquiry is whether the orders of protection were defective. Under New York law, N.Y. Crim. Proc. L. § 530.13(4) "authorizes a court to issue a permanent order of protection in favor of a victim or witness in a criminal action." Konieczny, 813 N.E.2d at 626. A court "cannot rely on [N.Y. Crim. Proc. L. §] 530.13 to issue an order of protection for a party unrelated to the *underlying criminal action*." Id. (emphasis added). Here, Fischer and Samantha Fischer were not witnesses in Petitioner's trial. Furthermore, since the underlying criminal action was Petitioner's violation of the Criminal Court Order against Sandra Dewall, Fischer and Samantha Fischer were also not named victims in this case. Therefore, the orders of protection in favor of Fischer and Samantha Fischer should not have been issued under N.Y. Crim. Proc. L. § 530.13(4) and were defective. See Konieczny, 813 N.E.2d at 626.

That said, the defective orders of protection had no impact on Petitioner's sentence. An "order of protection issued incident to a criminal proceeding . . . is not a part of the sentence imposed." People v. Nieves, 811 N.E.2d 13, 13 (N.Y. 2004) (holding that orders of protection are merely "ameliorative measure[s] intended to safeguard the rights of victims and witnesses both prior to and after conviction"). Additionally, defective orders of protection "do not render [Petitioner's] sentence of incarceration invalid." Id. Thus, under Nieves, the defective orders of protection in this case "do not render [Petitioner's] sentence of incarceration invalid." Id. As

earlier stated, this court is limited to deciding whether a conviction "violated the Constitution, laws, or treaties of the United States." McGuire, 502 U.S. at 67-68.

Since Petitioner's sentence was not affected by the defective orders of protection, the only relevant question here is whether Petitioner's constitutional rights were implicated by the defective orders of protection. Petitioner argues that his constitutional due process rights under the Confrontation Clause were violated because he had been denied the opportunity to "face his accuser." (Petition at 8). Petitioner's claim is without merit. "The Confrontation Clause provides two types of protections for a criminal defendant: the right physically to face *those who testify against him*, and the right to conduct cross-examination." Pennsylvania v. Ritchie, 480 U.S. 39, 51 (1987) (internal citations omitted) (emphasis added). Petitioner had the opportunity to face all the witnesses who testified in his trial, and defense counsel had the opportunity to cross-examine all the witnesses. Although Fischer and Samantha Fischer were erroneously named in the orders of protection, neither Fischer nor Samantha Fischer had been witnesses to Petitioner's trial. Thus, the Confrontation Clause is not implicated here. Therefore, Petitioner's constitutional due process rights to face his accusers were not violated.

**IV.      Conclusion**

For the aforementioned reasons, Dewall's petition for a writ of habeas corpus is denied.

The Clerk of Court is directed to close the case and serve a copy of this Memorandum & Order

on the pro se Petitioner.

SO ORDERED.

Dated:  August 20, 2008                         _____/s Nicholas G. Garaufis_____
        Brooklyn, New York              NICHOLAS G. GARAUFIS
                                        United States District Judge